SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
PETER H. KLEE, Cal. Bar No. 111707
  pklee@sheppardmullin.com
501 W. Broadway, 19th Floor
San Diego, California 92101
Telephone:  619.338.6500
Facsimile:   619.234.3815

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
SUZANNE Y. BADAWI, Cal. Bar No. 194692
  sbadawi@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  213.620.1780
Facsimile:   213.620.1398

Attorneys for Defendant
ALLSTATE INDEMNITY COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| DIANE MYERS,<br><br>            Plaintiff,<br><br>      v.<br><br>ALLSTATE INDEMNITY<br>COMPANY, DOES 1 to 20, inclusive,<br><br>            Defendants. | Case No. SACV14-00406-JLS (DFMx)<br><br>The Honorable Josephine L. Staton<br>Courtroom 10A<br><br>**DEFENDANT ALLSTATE<br>INDEMNITY COMPANY'S<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT OF<br>MOTION FOR SUMMARY<br>JUDGMENT, OR<br>ALTERNATIVELY, MOTION FOR<br>PARTIAL SUMMARY JUDGMENT**<br><br>DATE:  June 12, 2015<br>TIME:   2:30 p.m.<br><br>[Complaint Filed:  February 13, 2014] |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................1

II.   UNDISPUTED FACTS ........................................................................4

      A.    The Policy ...............................................................................4

      B.    April 2012-May 2012: The accident happens; Myers makes a
            claim for property damage and medical payments coverage;
            Allstate pays her property damage and medical payments
            coverage. ..................................................................................5

      C.    April 2012 –January 2013: Myers delayed 9 months in
            submitting her UIM claim until January 2013 ..........................5

      D.    January 24, 2013: Myers makes a UIM claim and demands
            $250,000 policy limits; her intention from day one is to spend
            this money on her electronic cigarette business. ....................5

      E.    January 2013 –March 2013: Myers delays almost three months
            providing missing medical reports; the missing report was from
            her orthopedic doctor who made a determination that her
            shoulder symptoms did not necessitate surgery. ......................6

      F.    March 2013: Most of Myers' claimed injuries were pre-existing
            and unrelated to the accident. ..................................................7

      G.    Notwithstanding the conflicting medical information, Allstate
            gives Myers credit for all of her medical treatment; Myers
            demands payment for a future knee surgery ............................8

      H.    April 2013: Allstate retains an independent orthopedic surgeon to
            evaluate Myers' new claim for a future knee surgery. ............9

      I.    April 2013-June 2013: Because Myers' lawyer fails to provide a
            medical authorization, Allstate is forced to subpoena her medical
            records. Myers delays in discovery. ........................................9

      J.    August 2013: Allstate subpoenas and receives medical records
            that reveal a pre-existing lower back injury, a history of chronic
            pain, and pre-accident treatment for back, head, legs, shoulder,
            and rib pain. .............................................................................9

      K.    August 2013: The parties agree to an arbitrator and an arbitration
            date of December 2013............................................................ 10

      L.    October 2013: The medical expert examines Myers and
            concludes that any need for future knee surgery is not related to
            the accident.  He also determines that she does not have a
            displaced rib and that her lower back injury is unrelated to the
            accident.................................................................................... 10

M.  November  2013 – December 2013: Allstate re-evaluates the claim.  Although the medical expert opinion determines that Myers does not need a future knee surgery as a result of the accident, Allstate nevertheless increases its valuation to $73,000....... 11

N.  December 11, 2013: Days before the arbitration, Myers makes a brand new monetary demand of over $66,000 for 4 years of future epidural injections in her lower back. ................................... 12

O.  December 13, 2013: The arbitrator rejects Myers' contention that the accident caused the need for future knee surgery, but 85% of his award is for claims that were not medically substantiated. ............ 12

P.  January 2014: Allstate pays Myers $230,000; Myers spends the insurance money on her electronic cigarette business. ........................ 13

III.  SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THERE WAS A GENUINE DISPUTE ABOUT THE VALUE OF MYERS' UIM CLAIM.................................................................. 13

A.  The Standards for Evaluating a Bad Faith Claim............................... 13

1.  Mistakes are not enough to show unreasonableness................. 14

2.  It is not unreasonable to withhold payment where there is a "genuine dispute" about the value or validity of the claim. ......................................................................................... 14

B.  The Bad Faith Claim Is Barred Because There Was a Genuine Dispute About the Value of Myers' Claim ......................................... 16

1.  There was a genuine dispute over Myers' claim for future knee surgery. ........................................................................... 16

2.  A genuine dispute exists where there is lack of documentation corroborating an insured's claims. .................... 16

3.  Allstate's reliance on the opinions of an independent expert  insulates the company from bad faith liability.............. 17

4.  There was also an inherent genuine dispute over general damages for pain and suffering. ................................................ 19

IV.  ALLSTATE CANNOT BE LIABLE FOR "UNREASONABLE DELAY" WHILE IT GATHERED RELEVANT INFORMATION TO EVALUATE MYERS' CLAIM. ................................................................. 20

V.  THE PUNITIVE DAMAGES CLAIM FAILS AS A MATTER OF LAW ......................................................................................................... 22

VI.  CONCLUSION.................................................................................... 24

## TABLE OF AUTHORITIES

Page(s)

Cases

*Adams v. Allstate Ins. Co.*
   187 F. Supp. 2d 1207 (C.D. Cal. 2002) ........................................................ 17

*Allstate Ins. Co. v. Madan*
   889 F. Supp. 374 (C.D. Cal. 1995) .............................................................. 17

*Anderson v. Liberty Lobby Inc.*
   411 U.S. 242 (1986) ..................................................................................... 23

*In re Angelia P.*
   28 Cal. 3d 908 (1981) .................................................................................. 23

*Aronson v. State Farm Ins.*
   2000 WL 667285 (C.D. Cal. May 11, 2000) .............................................. 18

*Badell v. Celtic Life Ins. Co.*
   1193 (N.D. Cal. 2001) ................................................................................. 17

*Badell v. Celtic Life Ins. Co.*
   159 F. Supp. 2d 1186 (N.D. Cal. 2001) ...................................................... 18

*Beagle v. Vasold*
   65 Cal. 2d 166 (1966) .................................................................................. 19

*Beck v. State Farm*
   54 Cal. App. 3d 347 (1976) ......................................................................... 23

*Blake v. Aetna Life Ins. Co.*
   99 Cal. App. 3d 901 (1979) ......................................................................... 21

*Board of Trustees of Univ. of Illlinois v. Insurance Corp. of Ireland*
   969 F. 2d 329 (7th Cir. 1992) ...................................................................... 23

*California Fair Plan Ass'n v. Superior Court*
   115 Cal. App. 4th 158 (2004) ...................................................................... 21

*Capelouto v. Kaiser Found. Hosp.*
   7 Cal. 3d 889 (1972) .................................................................................... 19

*Cardiner v. Provident Life and Accident Ins. Co.*
  158 F. Supp. 2d 1088 (C.D. Cal. 2001) ...................................................... 17, 18

*Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*
  90 Cal. App. 4th 335 (2001) ............................................ 13, 14, 15, 17

*Cruz v. HomeBase*
  83 Cal. App. 4th 160 (2000) ............................................................ 23

*Devonwood Condominium Owners Ass'n v. Farmers Ins. Exchange*
  162 Cal. App. 4th 1498 (2008) ...................................................... 17

*Fraley v. Allstate Ins. Co.*
  81 Cal. App. 4th 1282 (2000) ......................................................... 17

*Franceschi v. American Motorists Ins. Co.*
  852 F. 2d 1217 (9th Cir. Cal. 1988) ................................................. 15

*Globe Indemnity Co. V. Superior Court*
  6 Cal. App. 4th 725 (1992) ....................................................... 20, 21

*Greater Westchester Homeowners Assn. v. County of Los Angeles*
  26 Cal. 3d 86 (1979) ...................................................................... 19

*Guebara v. Allstate Ins. Co.*
  237 F. 3d 987 (9th Cir. 2001) .............................................. 14, 15, 17

*Hanson v. Prudential Ins. Co.*
  783 F.2d 762 (9th Cir. 1985) ........................................................ 14

*Herr v. State Farm Mut. Auto. Ins. Co.*
  152 F.3d 925 (9th Cir. 1998) ........................................................ 18

*Keshish v. Allstate Ins. Co.*
  959 F. Supp. 2d 1226 (C.D. Cal. 2013) ........................................ 17

*Klubnikin v. California Fair Plan Assn.*
  84 Cal. App. 3d 393 (1978) .......................................................... 17

*Leo v. State Farm Mut. Auto. Ins. Co.*
  939 F. Supp. 1186 (E.D. Pa. 1996) ........................................... 19, 20

*Love v. Fire Ins. Exch.*
  221 Cal. App. 3d 1136 (1990) ....................................................... 21

*Love v. Fire Insurance Exchange*
    221 Cal. App. 3d ......................................................................................... 21

*Lunsford v. American Guarantee & Liability Ins. Co.*
    18 F. 3d 653 (9th Cir. 1994) ..................................................................... 14

*Maynard v. State Farm Mut. Auto. Ins. Co.*
    499 F. Supp. 2d 1154 (C.D. Cal. 2007) ................................................... 18

*Maynard v. State Farm Mut. Auto. Ins. Co.*
    *499 F. Supp. 2d 1154 (C.D. Cal. 2007)* ................................................ 17

*Maynard v. State Farm Mut. Auto. Ins. Co.*
    499 F. Supp. 2d 1154 (C.D. Cal. 2007) ............................................ 16, 20

*Merritt v. Reserve Ins. Co.*
    34 Cal. App. 3d 858 (1973) ...................................................................... 14

*Miller v. Allstate Ins. Co.*
    1998 WL 937400 (C.D. Cal. Sept. 21, 1998) ......................................... 18

*Morris v. Paul Revere Life Ins. Co.*
    109 Cal. App. 4th 966 (2003) ................................................................... 15

*Notrica v. State Compensation Ins. Fund*
    70 Cal. App. 4th 911 (1999) ..................................................................... 14

*O'Hara v. Western Seven*
    75 Cal. App. 3d 798 (1977) ...................................................................... 23

*Paulson v. State Farm Mut. Auto. Ins. Co.*
    867 F. Supp. 911 (C.D. Cal. 1994) .......................................................... 18

*Phelps v. Provident Life Ins. Co.*
    60 F. Supp. 2d 1014 (C.D. Cal. 1999) ..................................................... 18

*Rappaport-Scott v. Interinsurance Exch. of the Automobile Club*
    146 Cal. App. 4th 831 (2007) .............................................................. 14, 15

*Seffert v. Los Angeles Transit Lines*
    56 Cal. 2d 498 (1961) ............................................................................... 19

*Shade Roods, Inc. v. Innovative Pros. Sales & Mktg.*
    78 Cal. App. 4th 847 (2000) ..................................................................... 23

*Stewart v. Truck Ins. Exch.*
    17 Cal. App. 4th 468 (1993) ................................................................ 22, 23

*Thompson v. Cannon*
    224 Cal. App. 3d 1413 (1990) ............................................................. 14, 21

*Tomaselli v. Transamerica Ins. Co.*
    25 Cal. App. 4th 1269 (1994) ..................................................................... 23

*White v. Ultramar, Inc.*
    21 Cal. 4th 563 (1999) ............................................................................... 23

*Yan Fang Du v. Allstate Ins. Co.*
    697 F.3d 753 (9th Cir. 2012) ...................................................................... 21

<u>Statutes</u>

Cal. Civ. Code
    § 3294 ....................................................................................................... 22
    § 3294(c)(1) .............................................................................................. 22
    § 3294(c)(2) .............................................................................................. 22
    § 3294(c)(3) .............................................................................................. 22

Cal. Ins. Code
    § 11582.2(e) ................................................................................................ 5
    § 11582.2(p)(5) ........................................................................................... 6

California Arbitration Act, Code of Civil Procedure § 1280 *et seq.* ..................... 17

Insurance Code § 11580.2(o) ............................................................................ 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      **<u>INTRODUCTION</u>**

Allstate has *fully paid* plaintiff Diane Myers' insurance claim. Thus, there is no breach of contract claim. The only claim in this lawsuit is for "bad faith delay," based on Myers' claim that she needed the money sooner to invest in her electronic cigarette business. As the undisputed facts establish, Allstate did not unreasonably delay payment of the claim.

This case involves Myers' claim for underinsured motorist ("UIM") benefits. The facts are neither complex nor disputed. Myers was insured under an Allstate automobile policy, which provided up to $250,000 in UIM benefits. In April 2012, Myers was involved in a car accident. She made a claim against the at-fault driver, who had $15,000 in liability coverage.

Nine months later, Myers made a UIM claim to Allstate, contending that she had an injury to her shoulder and knee, and pain in her lower back and rib. She demanded $250,000 policy limits, comprised of $52,919 for claimed medical expenses, which included a shoulder surgery, and the rest for pain and suffering.

Allstate evaluated the claim and observed that most of Myers' claimed injuries appeared to be pre-existing. For example, prior to the accident, Myers was treated for chronic pain in her lower back for which she received epidural injections, and for rib pain. No doctor since the accident has opined that she sustained an injury to her lower back or rib as a result of the accident. After the accident, Myers' first orthopedic doctor determined that her shoulder symptoms did not necessitate surgery and her MRI revealed pre-existing  arthritis and degenerative changes.

Despite the conflicting information, Allstate gave Myers credit for **<u>all</u>** of her medical treatment, including her shoulder surgery. Allstate offered her $73,000, which was enough to cover her $52,919 medical expenses, plus over $20,000 for pain and suffering.

Myers rejected the offer, and demanded that Allstate pay for a future surgery to her left knee to repair a meniscus tear. Allstate questioned that claim because the

MRI of her left knee showed that there was no meniscus tear, and instead revealed chondromalacia, a pre-existing degenerative knee disease.

Thus, a dispute arose concerning the need for a future knee surgery. In an effort to resolve this issue, Allstate retained an independent board certified orthopedic surgeon to provide an opinion. The expert concluded that there was no meniscus tear and any need for a future knee surgery was not related to the accident.

Because of the dispute over Myers' future knee surgery claim, the parties submitted the claim to arbitration, which is the dispute resolution procedure mandated by both the policy and the Insurance Code.

Just days before the arbitration, Myers announced a brand new demand for over $66,438 for "future" epidural injections in her lower back. This eleventh hour demand proved to be a cornerstone of the arbitrator's decision. Although the arbitrator agreed with Allstate that Myers did not need knee surgery, he nevertheless accepted her $66,438 demand for future epidural injections in her lower back. He also awarded her $175,000 in general damages for a "deformed displaced" rib. 85% of the award was for those two items, even though none of Myers' doctors opined that those claimed injuries were caused by the accident, and the only doctor who did opine on causation (an independent orthopedic surgeon) unequivocally determined that they were *not* caused by the accident.

The remaining 15% of the award was for medical expenses *which Allstate's offer covered*. In total, the arbitrator awarded Myers $296,000, which he reduced to policy limits of $250,000 ($230,000 after applicable offsets).

Allstate promptly paid the $230,000 award in full. Myers did not use the award to pay for future epidural injections in her back. Instead, she did what she said she would do – she invested the money in her electronic cigarette business.

Myers then filed this lawsuit against Allstate claiming it should have paid her sooner. The bad faith claim is untenable.

It is well-established that an insurer cannot be liable for withholding or delaying payment if there is a "genuine dispute" about the value of an insured's claim.  Here there were several genuine disputes regarding the value of Myers' claim, any one of which bars the bad faith claim:

First, the primary reason that the claim did not settle before arbitration was because Myers claimed that Allstate should pay for the cost of a future knee surgery.  Indeed, up until the arbitration, this was the only claimed injury that was in dispute.  That dispute was ultimately resolved in Allstate's favor, which demonstrates that the dispute was genuine.

Second, a genuine dispute exists where there are factual questions regarding the cause of the insured's injuries.  Here, none of Myers' doctors opined that Myers sustained a lower back injury or a "deformed displaced" rib as a result of the accident, and the only doctor who opined on causation (the independent orthopedic doctor) determined that those claimed injuries were not related to the accident.  Just because an arbitrator accepted those claims without the imprimatur of a medical professional does not mean that Allstate acted in bad faith by requiring medical documentation before paying them.

Third, a genuine dispute exists as a matter of law where the insurer relies on the opinion of an expert.  Here, Allstate relied on the conclusions of a board certified orthopedic surgeon regarding Myers' injuries.  This further insulates the company from bad faith liability.

Fourth, because reasonable people will disagree on how to put a dollar figure on pain and suffering, general damages are inherently subject to genuine dispute.  Here, most of the arbitrator's award was for general damages.  Because general damages are inherently subject to genuine dispute, and most of the award was for general damages, Allstate cannot be liable for bad faith.

Even apart from the numerous genuine disputes recited above, there is no evidence that Allstate unreasonably delayed payment, which is a separate and

independent reason why the bad faith claim fails.  It is well-established that an insurance company cannot be liable for withholding policy benefits while it gathers the information it needs to evaluate a claim.  Here, Allstate diligently investigated Myers' claim.  To the extent that there was any delay, it was attributable to Myers' delayed submission of a demand package by 9 months, failure to provide necessary medical reports for 12 months, and delayed responses to discovery.

**Punitive Damages**.  Regardless of how the Court rules on Myers' bad faith claim, it should grant partial summary judgment on her punitive damages claim. There is no evidence – let alone clear and convincing evidence – of malice, oppression, or fraud by Allstate, or ratification by a managing agent.

## II.   UNDISPUTED FACTS

### A.   The Policy

Myers was insured under an Allstate automobile policy. (Styles Decl., ¶6; Ex. 1.) The policy provided underinsured motorist ("UIM") coverage in the amount of $250,000 and medical payments coverage in the amount of $5,000. (Ex. 1, p. 12[1].)

UIM coverage is applicable where the at-fault driver does not have enough coverage to fully pay for an insured's claimed injuries.  To recover UIM benefits, the insured must first establish that the at-fault driver's insurance has been exhausted.  (Ex. 1, p. 34, "Limits of Liability," no. 4.) Medical payments coverage is available to pay for an insured's medical bills.

---

[1] Page numbers refer to the numbers at the bottom center of the exhibits, except for deposition references which are to the actual deposition page/line number.

Case No. SACV14-00406-JLS (DFMx)
SMRH:437033899.1
MEMO OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

**B.** **April 2012-May 2012: The accident happens; Myers makes a claim for property damage and medical payments coverage; Allstate pays her property damage and medical payments coverage.**

On April 3, 2012, Myers was involved in a car accident. She reported the accident to Allstate two weeks later on April 18, 2012. (Styles Decl., ¶7, Ex. 2 at pp. 66-67.)

In April 2012, Allstate inspected Myers' vehicle, and paid over $8,000 for the vehicle to be repaired and a rental car. (Styles Decl., ¶9, Ex. 4.) In May 2012, Allstate began paying medical payments coverage. Allstate has paid the full $5,000 medical payments coverage limit for Myers' medical expenses. (Styles Decl., ¶10; Ex. 5; Ex. 27, p. 43:3-17.)

**C.** **April 2012 –January 2013: Myers delayed 9 months in submitting her UIM claim until January 2013**

From April 2012 to January 2013, Myers did not make a UIM claim to Allstate. She made the claim in January 2013, after she received payment from the at-fault driver's insurer. (Styles Decl., ¶12; Ex. 7; Ex. 28, p. 16:10-18.)

**D.** **January 24, 2013: Myers makes a UIM claim and demands $250,000 policy limits; her intention from day one is to spend this money on her electronic cigarette business.**

On January 7, 2013, Myers prematurely demanded arbitration for her UIM claim before she made a UIM claim. (Styles Decl., ¶11; Ex. 6; Ex. 28, pp. 16:19-25.)

On January 24, 2013, Myers submitted a UIM claim to Allstate demanding $250,000 policy limits less offsets of $15,000[2], totaling a net demand of $235,000.

---

[2] There are two offsets that apply to reduce the amount of UIM coverage available under the policy: (1) payments made under the medical payments coverage [See Cal. Ins. Code section 11582.2(e); Ex. 1, p. 46, CA Amendatory Endorsement AU2250-7, Limits of Liability] and (2) payments made by the at-fault driver's

(Ex. 7, pp. 92-99.) She also submitted proof that she had been paid the $15,000 underlying limits from the at-fault driver. Myers' UIM claim was triggered on January 24, 2013, when she had exhausted the at-fault driver's policy limits.

In her January 2013 demand package, Myers specifically claimed damages of $52,919 for medical expenses and $300,000 for general pain and suffering, totaling $352,919. (Ex. 7, pp. 92-99.) She did not make a monetary demand for future medical expenses. (*Id.*)

Myers' intention, from the time she submitted her UIM claim, was to recover insurance money to invest in her electronic cigarette business. (Badawi Decl., ¶2; Ex. 27, pp. 123:11-128:8 [pp. 446-451 on bottom center of pages.]).

    **E.**    **<u>January 2013 –March 2013: Myers delays almost three months providing missing medical reports; the missing report was from her orthopedic doctor who made a determination that her shoulder symptoms did not necessitate surgery.</u>**

In her January 24, 2013 demand package, Myers included some medical records, but others were missing. (Badawi Decl., ¶3; Ex. 28, p. 48:5-18 (p. 476 on bottom center of exhibit) [Myers' attorney concedes that there were up to "ten times more" medical records than those he provided to Allstate.]). Because the demand package included only select medical records, on January 30, 2013, Allstate asked Myers' attorney to have Myers sign a medical authorization so that it could obtain all of her medical records. (Styles Decl., ¶13; Ex. 8.) Myers' attorney never provided the requested medical authorization to Allstate. (Styles Decl., ¶14.)

_____

insurer. [See Cal. Ins. Code section 11582.2(p)(5); Ex. 1, p. 34, Limits of Liability, No. 4.] Here, the actual offsets totaled $20,000 ($5,000 that Allstate paid for medical payments coverage and $15,000 payments made by the at-fault driver's insurer), as confirmed in arbitration award.

In February 2013, Allstate asked Myers for specific missing medical records while it awaited the medical authorization it previously requested. (Styles Decl., ¶¶15, 16; Ex. 9, 10.) In March 2013, Myers provided the missing medical records. (Styles Decl., ¶17; Ex. 11.) The missing records were from her first orthopedic surgeon who she saw after the accident.  He ordered an MRI of her shoulder and based on the findings determined that her shoulder symptoms did not necessitate surgery. (Ex. 11, p. 259.) The report raised a question about the medical necessity of a shoulder surgery.

**F.     Most of Myers' claimed injuries were pre-existing and unrelated to the accident.**

Myers was claiming that she sustained a left shoulder injury for which she underwent surgery, a meniscus tear in her left knee, and pain in her lower back and rib.  In March 2013, Allstate evaluated the claim and observed:

- *The left shoulder claim:* Myers' orthopedic doctor determined that her shoulder symptoms did not necessitate surgery, based on his review of her MRI.  Her MRI revealed pre-existing arthritis and degenerative changes.

- *The left knee claim:* Myers underwent an MRI of her knee which showed there was no meniscus tear, and that she had chondromalacia, a pre-existing degenerative disease.

- *The lower back claim:* Right after the accident, Myers' physical therapist reported that Myers' lower back injury was pre-existing. None of Myers' three doctors – two orthopedic surgeons and one pain management doctor – opined that she sustained a back injury as a result of the accident.

- *The right rib claim:* None of Myers' three doctors – two orthopedic surgeons and one pain management doctor – opined that she sustained a

1    rib injury, much less a "deformed displaced" rib as a result of the

2    accident.

3    (Styles Decl., at ¶18; Ex. 7, at pp. 187, 195, 203, 260 [April 2012 report documents

4    "pre-existing conditions:…low back pain"], p. 122 [left shoulder rotator cuff

5    tendinitis, left knee PF arthralgia], p. 138 [chondromalacia in the knee], p. 159 [knee

6    MRI shows chondromalacia], p. 162 [shoulder MRI shows rotator cuff tendinosis,

7    joint degenerative changes]; Ex. 11, p. 259 [doctor reports that "I have encouraged

8    her to go to physical therapy as her symptoms at this point are not dramatic enough

9    to necessitate surgical consideration"] and p. 258 [shoulder arthritis and joint

10   degenerative changes noted]; Ex. 2, pp. 55-56.)

11   **G.**   **Notwithstanding the conflicting medical information, Allstate gives**

12   **Myers credit for all of her medical treatment; Myers demands**

13   **payment for a future knee surgery**

14   Notwithstanding the conflicting information, Allstate gave Myers credit for

15   all of her medical treatment in its evaluation. (Styles Decl., ¶19; Ex. 12.) Allstate

16   valued the claim at $45,500, comprised of $25,500 new money and $20,000 in

17   applicable offsets. (Styles Decl., at ¶¶19-21; Ex. 13 [confirming offer]; Ex. 27, at p.

18   46:3-13.)  The offer included all of Myers' reasonable medical expenses of $31,724[3]

19   plus about $14,000 for pain and suffering. (Styles Decl., at ¶¶19-21; Ex. 12, Ex. 2, at

20   pp. 55-56.) On March 28, 2013, Myers' lawyer rejected Allstate's offer and

21   demanded payment for a future knee surgery. (Ex. 13.)

22

23

24   _____

25   [3] Allstate accepted all of Myers' medical treatment in its evaluation, and offered her

26   the reasonable and customary amounts for her medical expenses which was
     determined by an adjuster with 29 years of adjusting UIM insurance claims. (Styles

27   Decl., ¶19; Ex. 12; Ex. 2, pp. 55-56.) Indeed, Myers' medical bills were ultimately

28   discounted by the medical providers. (Ex. 28, p. 50:6-55:14.)

**H.**   **April 2013: Allstate retains an independent orthopedic surgeon to evaluate Myers' new claim for a future knee surgery.**

In April 2013, based on the future knee surgery claim and the pre-existing conditions (i.e., the lower back pain and the knee chondromalacia), Allstate decided to retain an independent orthopedic surgeon to provide a medical opinion regarding Myers' injuries. (Styles Decl., ¶22; Ex. 2, at p. 54.)

**I.**   **April 2013-June 2013: Because Myers' lawyer fails to provide a medical authorization, Allstate is forced to subpoena her medical records. Myers delays in discovery.**

Prior to having Myers examined by the independent doctor, Allstate sought to obtain all of her medical records to provide to the doctor. Thus, on April 23, 2013, Allstate's attorney immediately propounded written discovery to Myers asking her for all her medical providers so that Allstate could subpoena the medical providers. (Dadaian decl., ¶¶6-8, Exs. 15, 16.) On May 31, 2013, Myers asked for an extension of time to respond to the discovery until June 21, 2013. (*Id.*) On or about June 21, 2013, Myers served discovery responses. (*Id.*) Myers identified her medical providers and Allstate was in a position to subpoena them.

**J.**   **August 2013: Allstate subpoenas and receives medical records that reveal a pre-existing lower back injury, a history of chronic pain, and pre-accident treatment for back, head, legs, shoulder, and rib pain.**

By August 2013, Allstate's counsel subpoenaed and received medical records from Myers' medical providers.  Those records revealed additional pre-existing injuries to some of the same body parts that Myers was claiming in this accident:

- From 2008 through 2011, Myers was treated for a lower back injury for which she received epidural injections.  No doctor has opined that the April 2012 accident exacerbated or caused a lower back injury.

- From 2008 up through 2011, Myers was diagnosed with chronic pain, and was treated for pain to her back, head, legs, shoulder, and rib.
- Prior to this accident, Myers made workers compensation claims for injuries, and in one, she claimed injuries to her back.
- In 2011, Myers was treated for a prescription medication addiction, which raised questions about some of her post-accident pain complaints for which she received opiate/barbiturate prescriptions.

(Ex. 14; Dadaian Decl., ¶12; Styles Decl., at ¶¶24-25.)

**K.    August 2013: The parties agree to an arbitrator and an arbitration date of December 2013.**

In July 2013, Allstate agreed to use one of the arbitrators that Myers' attorney selected. (Dadaian Decl., ¶¶9, 13-14; Exs. 17,19.) In August 2013, after receiving discovery and subpoenaed records, Allstate's counsel took Myers' deposition.  In August 2013, the parties and the arbitrator agreed to an arbitration date of December 2013. (Dadaian Decl., ¶¶9, 13-14; Exs. 17,19.)

**L.    October 2013: The medical expert examines Myers and concludes that any need for future knee surgery is not related to the accident. He also determines that she does not have a displaced rib and that her lower back injury is unrelated to the accident.**

On or about September 3, 2013, Allstate scheduled the examination of Myers with the independent orthopedic surgeon for October 18, 2013. Prior to the examination, Allstate's counsel provided the surgeon with all of Myers' medical records that she had received from the medical providers.

On October 18, 2013, the independent orthopedic surgeon examined Myers, reviewed her records, and prepared a report.[4] (Ex. 22; Styles Decl., ¶28.) In his report, the surgeon concluded:

- Myers sustained a soft tissue shoulder injury and possible knee bruising from the accident, and that the injections and physical therapy treatment that she received for those injuries was reasonable.  However, he agreed with Myers' first orthopedic doctor that shoulder surgery was not medically necessary based on Myers' symptoms and MRI results, and that she should have completed physical therapy to see if that resolved her pain.

- Myers had chondromalacia, a pre-existing degenerative knee disease, and that any need for a future knee surgery was not attributable to the accident.

- Myers did not sustain a lower back injury as a result of the accident. (Ex. 22.)

The doctor also examined Myers' rib and determined there was no rib dislocation and that she may have had some bruising from the accident. (Ex. 21, deposition, at pp. 6:11-8:2 [pp. 345-347 on bottom center of exhibit]).

### M.     November  2013 – December 2013: Allstate re-evaluates the claim. Although the medical expert opinion determines that Myers does not need a future knee surgery as a result of the accident, Allstate nevertheless increases its valuation to $73,000.

In November 2013, Allstate re-evaluated the claim based on the medical expert's report.  Although Allstate had already made an offer that covered all of Myers' medical expenses, and although the medical expert determined that Myers

---

[4] The surgeon received some additional records after his evaluation that did not change his opinions documented in his October 2013 report. (Dadaian Decl., ¶¶16-18; Ex. 21, pp. 6:11-8:2.)

1   did not need a future knee surgery as a result of the accident, Allstate raised its
2   valuation to $73,000 ($53,000 new money offer, after the $20,000 offsets) in an
3   effort to resolve the claim. (Styles Decl., ¶29; Dadaian Decl., ¶19; Ex. 27, pp. 84:8-
4   22, 92:6-16; Ex. 28, pp. 23:10-24:10.)

5       That amount was enough to cover all of Myers' claimed medical expenses
6   ($52,919), plus over $20,000 for pain and suffering.  Myers rejected the offer, and
7   continued to demand policy limits.

8       **N.    December 11, 2013: Days before the arbitration, Myers makes a**
9           **brand new monetary demand of over $66,000 for 4 years of future**
10          **epidural injections in her lower back.**

11      On December 11, 2013, in her arbitration brief, Myers announced a brand
12  new monetary demand of $66,438 for "future" epidural injections in her lower back
13  for a period of 4 years. (Ex. 23; Dadaian Decl., ¶21.) This demand was not
14  previously made to Allstate, and no doctor in any reports submitted to Allstate
15  opined that Myers' lower back pain was related to the accident. (Styles Decl., ¶31.)

16      **O.    December 13, 2013: The arbitrator rejects Myers' contention that**
17          **the accident caused the need for future knee surgery, but 85% of**
18          **his award is for claims that were not medically substantiated.**

19      On December 13, 2013, the arbitration took place. (Dadaian Decl., ¶¶22, 23;
20  Ex. 24.) The arbitrator agreed with Allstate that any need for a future knee surgery
21  was ***not*** related to the accident. (Ex. 24.)

22      He awarded Myers' $67,938 for future medicals which included her request
23  for $66,438 for future epidural injections in her lower back.  (*Id.*) He also awarded
24  her $175,000 in general damages for a "deformed displaced" rib. (*Id.*) Those two
25  items were awarded even though none of Myers' doctors opined on the cause of
26  those injuries, and the only doctor who did opine on the cause (an independent
27  orthopedic surgeon) unequivocally determined that they were ***not*** related to the
28  accident.

1   The arbitrator also awarded $54,717[5] for medical expenses – which amount

2   Allstate's offer covered. (*Id.*) The total award was for $296,000, which was reduced

3   to policy limits of $250,000 ($230,000 after applicable offsets). (*Id.*)

4        Myers and her attorney have since conceded that they had no documentation

5   to support the $67,938 future back injections, and they never even discussed it with

6   her doctors. (Badawi Decl.. ¶¶2, 3; Ex. 27, pp. 143:14-144:24. [pp. 452-453 on the

7   bottom center of page]; Ex. 28, pp. 78:15-79:25 [pages 484-485 on the bottom

8   center of page].).  The questionable nature of the claim is further demonstrated by

9   the fact that Myers did not receive future back injections. (Ex. 27, pp. 56:9-10  [p.

10  430 on bottom center of page] and p. 58:3-18, 59:2-60:24 [pp. 432-433 on bottom

11  center of page].).

12  **P.    January 2014: Allstate pays Myers $230,000; Myers spends the**

13  **insurance money on her electronic cigarette business.**

14       In January 2014, Allstate paid the full $230,000 arbitration award. (Styles

15  Decl., ¶33; Ex. 25; Ex. 28, p. 25:3-14 [p. 472].). Myers hasn't spent the money on

16  future epidural injections in her back. (Ex. 27, pp. 56:9-10 [p. 430] and pp. 58:3-18,

17  59:2-60:24 [pp. 432-433].). Instead, Myers decided to spend the money on her

18  booming electronic cigarette business. (Ex. 27, pp. 123:11-128:8 [pp. 446-451].).

19  **III.   SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE**

20  **THERE WAS A GENUINE DISPUTE ABOUT THE VALUE OF**

21  **MYERS' UIM CLAIM**

22  **A.    The Standards for Evaluating a Bad Faith Claim**

23       Even if an insurance company withholds policy benefits that it is ultimately

24  required to pay, that does not mean it breached the implied covenant of good faith

25  and fair dealing. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins.*

26  _____

27  [5] Myers had also announced an increase in her medical expenses to $54,717 <u>two</u>

28  <u>days</u> before the arbitration in her arbitration brief. (Ex. 23.)

1     *Co.*, 90 Cal. App. 4th 335, 346-47 (2001); *Hanson v. Prudential Ins. Co.*, 783 F.2d

2     762, 766 (9th Cir. 1985). The implied covenant requires insurers to be reasonable,

3     not flawless or prescient. *Chateau Chamberay*, 90 Cal. App. 4th at 346-47.

4     Therefore, to establish a breach of the implied covenant, a plaintiff must show that

5     the insurer withheld benefits unreasonably and without proper cause. *Guebara v.*

6     *Allstate Ins. Co.*, 237 F. 3d 987, 992 (9th Cir. 2001); *Rappaport-Scott v.*

7     *Interinsurance Exch. of the Automobile Club*, 146 Cal. App. 4th 831, 837 (2007).

8     **1. *Mistakes are not enough to show unreasonableness.***

9     "Bad faith implies dishonesty, fraud and concealment." *Merritt v. Reserve*

10    *Ins. Co.*, 34 Cal. App. 3d 858, 876 (1973). Thus, "a mere difference or a mere

11    mistake in judgment is not bad faith. People disagree all the time. A mistake, a

12    difference of opinion, a different judgment that an individual might have, that isn't

13    bad faith; there has to be something more. The conduct has to be so unreasonable, so

14    without reason, that it is bad faith." *Notrica v. State Compensation Ins. Fund*, 70

15    Cal. App. 4th 911, 931 (1999).

16    Moreover, "[i]n addition to the duty to deal fairly with the insured, an insurer

17    owes competing duties to other policyholders and to stockholders not to honor

18    meritless claims." *Thompson v. Cannon*, 224 Cal. App. 3d 1413, 1417 (1990).

19    **2. *It is not unreasonable to withhold payment where there is a "genuine dispute" about the value or validity of the claim.***

20

21    Withholding insurance benefits is not unreasonable where a legitimate

22    question - in legal terms, a "genuine issue" or "genuine dispute" - exists regarding

23    either coverage or the amount of payment due. *Guebara*, 237 F. 3d at 992; *Lunsford*

24    *v. American Guarantee & Liability Ins. Co.*, 18 F. 3d 653, 656 (9th Cir. 1994).

25    "[W]here there is a genuine issue as to the insurer's liability under the policy for the

26    claim asserted by the insured, there can be no bad faith liability imposed on the

27    insurer for advancing its side of that dispute." *Chateau Chamberay*, 90 Cal. App.

28    4th at 347.

An insurer "is entitled to be an advocate for its own interests." *Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 976 (2003).  So even if it offers less for a claim than it should have paid, the insurer cannot be liable for bad faith if a genuine dispute existed:

> It is now settled law in California that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith, even though it might be liable for breach of contract.

*Chateau Chamberay*, 90 Cal. App. 4th at 347; *Franceschi v. American Motorists Ins. Co.*, 852 F. 2d 1217, 1220 (9th Cir. Cal. 1988) ("a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, even if the court concludes the claim is payable under the policy terms, so long as there existed a genuine issue as the insurer's liability").

Establishing a "genuine dispute" does not require a showing that the insurance company was clearly right, or even that the insurance company's position was "more" correct than the insured's position.  Instead, a "genuine dispute" simply means that reasonable minds could differ about the value of the claim.  *Rappaport-Scott*, 146 Cal. App. 4th at 839; *Chateau Chamberay*, 90 Cal. App. 4th at 350-51.

Whether a genuine dispute exists can and should be decided on summary judgment. *Guebara*, 237 F. 3d at 992 ("Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage."); *see also Franceschi*, 852 F. 2d at 1220, *Chateau Chamberay*, 90 Cal. App. 4th at 347.  In deciding whether there was a genuine dispute, "the court does not decide which party is 'right' as to the disputed matter, but only that a reasonable and legitimate dispute actually existed." *Chateau Chamberay*, 90 Cal. App. 4th at 347.

### B. The Bad Faith Claim Is Barred Because There Was a Genuine Dispute About the Value of Myers' Claim

#### 1. There was a genuine dispute over Myers' claim for future knee surgery.

The primary reason that the claim did not settle before arbitration was because Myers claimed that Allstate should pay for the cost of a future knee surgery. Indeed, up until the arbitration, this was the only claimed injury that was in dispute and that Allstate had disallowed.  Allstate disallowed the claim based on the opinion of a medical expert, and that decision was validated by the arbitrator who also disallowed the future knee surgery.  Thus, there was clearly a genuine dispute over whether Myers needed a future knee surgery as a result of the accident.  That dispute was ultimately resolved in Allstate's favor.

Because there was a genuine dispute over the value of Myers' UIM claim, Allstate is entitled to summary judgment.

#### 2. A genuine dispute exists where there is lack of documentation corroborating an insured's claims.

One way of establishing the existence of a genuine dispute is to show that there were factual questions regarding the nature and extent of the insured's injuries and lack of documentation corroborating the insured's claims. *Maynard v. State Farm Mut. Auto. Ins. Co.,* 499 F. Supp. 2d 1154, 1162-63 (C.D. Cal. 2007).

Thus, an insurer cannot be liable for bad faith for requiring medical documentation to corroborate a claim before paying for it.  Here, no doctor ever attributed the lower back injury or a purported rib "deformity" to the accident. The independent orthopedic surgeon, who was the only doctor who opined on causation, unequivocally determined that the back injury was not related to the accident and that there was no rib dislocation at all, let alone one causing a deformity.  Just because the arbitrator accepted those claims without the imprimatur of a medical professional does not mean that Allstate acted in bad faith by requiring medical documentation before paying them.

### 3. *Allstate's reliance on the opinions of an independent expert insulates the company from bad faith liability.*

The genuine dispute doctrine applies with particular force where, as here, the insurer relies on an independent expert opinion. *Fraley v. Allstate Ins. Co.,* 81 Cal. App. 4th 1282, 1291-92 (2000) (reliance on an independent expert established the existence of a "genuine dispute" as a matter of law); *Keshish v. Allstate Ins. Co.,* 959 F. Supp. 2d 1226 (C.D. Cal. 2013) (insurer's reliance on the opinion of an independent expert insulated the company from bad faith liability – even though the appraiser disagreed with the expert's valuation and awarded the insured five times the amount of Allstate's estimate).

Applying California law, courts routinely dismiss bad faith claims at the summary stage where, as here, the insurance company's decision was based on the opinion of an expert. *See, e.g., Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 994-95 (9th Cir. 2001) (arson expert); *Cardiner v. Provident Life and Accident Ins. Co.,* 158 F. Supp. 2d 1088, 1102 (C.D. Cal. 2001) (medical expert); *Adams v. Allstate Ins. Co.,* 187 F. Supp. 2d 1207, 1215 (C.D. Cal. 2002) (construction expert); *Allstate Ins. Co. v. Madan,* 889 F. Supp. 374, 380 (C.D. Cal. 1995) (arson expert); *Badell v. Celtic Life Ins. Co.*, 1193 (N.D. Cal. 2001) (medical expert); *see also Maynard,* 499 F. Supp. 2d at 1163 (medical expert). This is so even where (i) the insured offers contrary expert opinions and (ii) the trier of fact ultimately resolves the conflicting expert opinions in favor of the insured. *Chateau Chamberay*, 90 Cal. App. 4th at 349-51; *Fraley*, 81 Cal. App. 4th at 1293.[6]

---

[6] Even though *Fraley* and *Keshish* involved an appraisal award, the cases are equally applicable to arbitration awards. *See Klubnikin v. California Fair Plan Assn.*, 84 Cal. App. 3d 393, 398 (1978); *Devonwood Condominium Owners Ass'n v. Farmers Ins. Exchange*, 162 Cal. App. 4th 1498, 1505 (2008) ("Appraisal award proceedings are subject to the arbitration provisions outlined in the California Arbitration Act, Code of Civil Procedure section 1280 *et seq.*").

1    In particular, an insurer is entitled to rely on expert medical opinion.

2    *Maynard,* 499 F. Supp. 2d at 1163 (insurer "entitled to rely on its orthopedic

3    surgeon's report to dispute plaintiff's claim"); *Badell,* 159 F. Supp. 2d at 1193;

4    *Cardiner,* 158 F. Supp. 2d at 1102.

5        Here, it is undisputed that in evaluating Myers' UIM claim, Allstate relied on

6    the opinions of an independent expert.  The expert concluded that any need for a

7    future knee surgery was not attributable to the accident, and that Myers did not

8    sustain a lower back injury or a dislocated rib as a result of the accident.  Allstate

9    was entitled to rely on the opinion of its independent medical expert.  The implied

10   covenant did not require Allstate to resolve good faith doubts against itself and in

11   favor of the insured.  *Phelps v. Provident Life Ins. Co.,*  60 F. Supp. 2d 1014, 1022

12   (C.D. Cal. 1999); *Aronson v. State Farm Ins.,* 2000 WL 667285, at *10  (C.D. Cal.

13   May 11, 2000).

14       The fact that the arbitrator ultimately awarded an amount that was greater

15   than Allstate's offer is irrelevant.  *Herr v. State Farm Mut. Auto. Ins. Co.,* 152 F.3d

16   925 (9th Cir. 1998) ("The fact that Dr. Herr won an award in the arbitration does not

17   prove that State Farm handled the claim in bad faith.  It proves only that he won and

18   State Farm lost.") (unpublished); *Maynard,* 499 F. Supp. 2d at 1161 n.5 ("[A]n

19   arbitrator's ultimate conclusion on liability is irrelevant to a bad faith claim.");

20   *Paulson v. State Farm Mut. Auto. Ins. Co.,* 867 F. Supp. 911, 919 (C.D. Cal. 1994)

21   ("The fact that . . . the arbitrator subsequently found that State Farm owed [the

22   insured] the limit of his policy does not imply that State Farm acted in bad faith in

23   the first instance."); *Aronson,* 2000 WL 667285 at *10 ("The value that an arbitrator

24   subsequently places on a[] claim is an after-the-fact event that may not be

25   considered in evaluating the insurer's conduct prior to the arbitration."); *Miller v.*

26   *Allstate Ins. Co.,* 1998 WL 937400, at *5 (C.D. Cal. Sept. 21, 1998) ("The fact that

27   an arbitrator later determined that defendant owed $11,800 to Miller instead of the $

28   1,820 offered by Allstate does not by itself constitute bad faith or unfair dealing.");

*see also*, *Chateau Chamberay*, 90 Cal. App. 4th at 342-43 (granting summary judgment where insurer's final offer was $722,000 below arbitration award); *Fraley*, 81 Cal. App. 4th at 1287 (granting summary judgment where insurer's offer was $164,822 and arbitration award was $364,500).

The Court should therefore grant summary judgment.

### 4. *There was also an inherent genuine dispute over general damages for pain and suffering.*

Allstate's $73,000 offer was enough to cover all of Myers' medical expenses, plus an additional amount for pain and suffering.

Putting a dollar value on pain and suffering is one of the most difficult and least precise tasks in the law. "Translating pain and anguish into dollars can, at best, be only an arbitrary allowance, and not a process of measurement." *Beagle v. Vasold*, 65 Cal. 2d 166, 172 (1966). *Accord Capelouto v. Kaiser Found. Hosp.*, 7 Cal. 3d 889, 892 (1972) (pain and suffering "can be translated into monetary loss only with great difficulty"); *Greater Westchester Homeowners Assn. v. County of Los Angeles*, 26 Cal. 3d 86, 103 (1979) (damages for pain and suffering "are inherently nonpecuniary, unliquidated and not readily subject to precise calculation.").

Thus, by its very nature, the value of general damages is subject to genuine dispute. "The amount to be awarded [for pain and suffering] is '*a matter on which there legitimately may be a wide difference of opinion*." *Seffert v. Los Angeles Transit Lines*, 56 Cal. 2d 498, 508 (1961) (citation omitted).

As a result, courts in UIM cases have specifically held that insurers cannot be liable for bad faith for offering less for general damages than what an insured demands or eventually recovers. For example, in *Leo v. State Farm Mut. Auto. Ins. Co.*, 939 F. Supp. 1186 (E.D. Pa. 1996), the insurer offered $25,000 for pain and suffering, but the arbitrator awarded $75,000. In a later bad faith suit, the court noted that pain and suffering is inherently "subjective in nature," therefore held that

1  the insurer's offer was reasonable as a matter of law, and granted summary

2  judgment for the insurer. *Id.* at 1191.

3      Here, most of the arbitration award was for general damages for pain and

4  suffering.  Although Myers demanded $300,000 for general damages, the arbitrator

5  awarded her about 100% less than her demand ($175,000 award).  The difference

6  between Myers demand and the awarded demonstrates the difficulty in putting a

7  dollar value on pain and suffering.  Moreover, it becomes even more difficult when

8  it is awarded for injuries that are not corroborated by documentation.  Here, the

9  entire general damages award was for the purported rib "deformity" which no doctor

10  attributed to the accident.

11      Thus, the dispute over the value of general damages was, by its very nature,

12  genuine.  This is another reason why Allstate cannot be liable for bad faith.

13  **IV.   ALLSTATE CANNOT BE LIABLE FOR "UNREASONABLE DELAY"**

14      **WHILE IT GATHERED RELEVANT INFORMATION TO**

15      **EVALUATE MYERS' CLAIM.**

16      Even apart from the genuine dispute doctrine, Myers' bad faith claim fails

17  because there is no evidence that Allstate unreasonably delayed payment of the

18  claim.

19      Under California law, "[t]here can be no 'unreasonable delay' until the

20  insurer receives adequate information to process the claim and reach an agreement

21  with the insured."  *Globe Indemnity Co. V. Superior Court*, 6 Cal. App. 4th 725, 731

22  (1992); *accord Maynard*, 499 F. Supp. 2d at 1160 ("delay while the insurer seeks

23  information and investigates the insured's claim" does not give rise to liability for

24  bad faith).  In fact, it would be "improvident" for an insurer to pay a claim before it

25  receives information verifying the amount claimed:

26          [W]e see nothing at all unusual about Aetna's decision not
           to pay but to continue the investigation.  Beyond acting in
27          good faith at that time, Aetna would have been
           improvident with its stockholders' assets in paying the
28          claim on the basis of how little it knew.

*Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 921 (1979) . Thus, an insurer may withhold benefits "until it [can] find out on its own, to a measure of certainty," that the benefits are owed. *Id.* at 924. And if the insurer believes that a claim is unjustified, it has a duty to contest the claim. As explained in *Love v. Fire Insurance Exchange*, 221 Cal. App. 3d at 1149:

> An insurer . . . may give its own interests consideration equal to that it gives the insured [Citation], it is not required to disregard the interests of its shareholders and other policyholders when evaluating claims [Citation], and it is not required to pay non-covered claims, even though payment would be in the best interests of its insured [Citation].

As the above-cited cases demonstrate, Allstate was not required to take Myers' word that her claim was worth $250,000. Rather, Allstate was entitled to obtain the relevant medical records and evaluate for itself the value of Myers' UIM claim – which is exactly what Allstate did. *Yan Fang Du v. Allstate Ins. Co.*, 697 F.3d 753, 759 (9th Cir. 2012); *see also Glob Indem Co.*, 6 Cal. App. 4th at 731; *California Fair Plan Ass'n v. Superior Court*, 115 Cal. App. 4th 158, 162-66 (2004) (there can be no unreasonable delay or denial of a claim until the insurer receives the information necessary to process the claim).

In fact, not only does an insurer have the right to fully investigate a claim, it has a *duty to contest* claims that it believes are not justified: "In addition to the duty to deal fairly with the insured, an insurer owes competing duties to other policyholders and to stockholders not to honor meritless claims." *Thompson v. Cannon*, 224 Cal. App. 3d 1413, 1417 (1990); *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1149 (1990) (same).

Here, the undisputed evidence establishes that, to the extent there were any delays, they were caused by Myers, not Allstate. For example, Myers' delayed submission of a demand package by <u>9 months</u> (from April 2012 to January 2013),

1 failed to provide necessary medical reports for <u>12 months</u> (from April 2012 to

2 March 2013), and delayed serving discovery responses (May 2013 to June 2013).

3      Moreover, an insurance company cannot be liable for withholding policy

4 benefits while it awaits a signed medical authorization. Insurance Code § 11580.2(o)

5 requires an insured to provide medical authorizations, and stays all proceedings until

6 30 days after that requirement is met.  Thus, the arbitration proceeding was stayed

7 due to Myers' failure to provide the requested medical authorization.

8 **V.   THE PUNITIVE DAMAGES CLAIM FAILS AS A MATTER OF LAW**

9      Regardless of how the Court rules on Myer's bad faith claim, it should

10 eliminate her claim for punitive damages because she has no evidence to support it.

11      Several standards governing punitive damages apply here.  First, to recover

12 punitive damages, Myers must provide clear and convincing evidence of fraud,

13 oppression or malice. Cal. Civ. Code § 3294.

14 •    "Fraud" is "an intentional misrepresentation, deceit or concealment of a

15     material fact known to the defendant with the intention on the part of the

16     defendant of thereby depriving a person of property or legal rights or

17     otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

18 •    "Oppression" means "despicable conduct that subjects a person to cruel

19     and unjust hardship in conscious disregard of the person's rights." Cal.

20     Civ. Code § 3294(c)(2).  "Despicable conduct" is conduct "so vile, base,

21     contemptible, miserable, wretched or loathsome that it would be looked

22     down upon and despised by ordinary decent people." *Stewart v. Truck*

23     *Ins. Exch.*, 17 Cal. App. 4th 468, 483 n. 29 (1993).

24 •    "Malice" means either (1) "conduct which is intended by the defendant

25     to cause injury to the plaintiff or (2) "despicable conduct which is

26     carried on by the defendant with a willful and conscious disregard for

27     the rights or safety of others." Cal. Civ. Code § 3294(c)(1).  "Evil

28

1     motive is the central element of the malice which justifies an exemplary

2     award." *O'Hara v. Western Seven*, 75 Cal. App. 3d 798, 806 (1977).

3         Second, on summary judgment, the court must test a punitive damages claim

4 under the heightened "clear and convincing evidence" standard. *Anderson v. Liberty*

5 *Lobby Inc.*, 411 U.S. 242, 254 (1986) ("in ruling on a motion for summary

6 judgment, the judge must view the evidence presented through the prism of the

7 substantive evidentiary burden"); *Board of Trustees of Univ. of Illinois v. Insurance*

8 *Corp. of Ireland*, 969 F. 2d 329, 332 (7th Cir. 1992) (applying "clear and

9 convincing" standard on motion for summary judgment).  Thus, to survive summary

10 judgment, Myers must present evidence for punitive damages that is strong enough

11 to command "the unhesitating assent of every reasonable mind." *In re Angelia P.*, 28

12 Cal. 3d 908, 919 (1981).

13         Third, "the evidence required to support an award of punitive damages for

14 breach of the implied covenant of good faith and fair dealing is 'of a different

15 dimension' from that needed to support a finding of bad faith." *Shade Roods, Inc. v.*

16 *Innovative Pros. Sales & Mktg.*, 78 Cal. App. 4th 847, 909-10 (2000) (citation

17 omitted).  Evidence of bad faith - without more - does not support a claim for

18 punitive damages. *Beck v. State Farm*, 54 Cal. App. 3d 347, 355-56 (1976);

19 *Stewart,*17 Cal. App. 4th at 483.

20         Fourth, "some evidence should be required that is inconsistent with the

21 hypothesis that the tortious conduct was the result of a mistake of law or fact, honest

22 error of judgment, over-zealousness, mere negligence or other such non-iniquitous

23 human failing." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1287-88

24 n. 14 (1994). Finally, a plaintiff seeking punitive damages against a corporation

25 must show by clear and convincing evidence that the act constituting malice or

26 oppression was committed or ratified by an "officer, director, or managing agent."

27 *Cruz v. HomeBase,* 83 Cal. App. 4th 160, 163 (2000); *White v. Ultramar, Inc.*, 21

28 Cal. 4th 563 (1999).

1  Here, Myers cannot meet these stringent standards.  There is no evidence -
2  much less clear and convincing evidence - of malice, oppression, fraud, or
3  ratification by a managing agent.  Therefore, the Court should grant partial summary
4  judgment on the claim for punitive damages.

5  **VI.**   **CONCLUSION**

6  For the foregoing reasons, Allstate respectfully requests that the Court grant
7  its Motion for Summary Judgment in full.  In the alternative, Allstate requests that
8  the Court grant partial summary judgment of the punitive damages claim.

9  Dated:  April 30, 2015

10                                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

11
                                  By _____
12                                           /s/ Suzanne Y. Badawi
                                         PETER H. KLEE
13                                       SUZANNE Y. BADAWI
                                         Attorneys for Defendant
14                                    ALLSTATE INDEMNITY COMPANY

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. SACV14-00406-JLS (DFMx)
SMRH:437033899.1
MEMO OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT