SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
PETER H. KLEE, Cal. Bar No. 111707
    pklee@sheppardmullin.com
501 W. Broadway, 19th Floor
San Diego, California 92101
Telephone:   619.338.6500
Facsimile:    619.234.3815

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
SUZANNE Y. BADAWI, Cal. Bar No. 194692
    sbadawi@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:   213.620.1780
Facsimile:    213.620.1398

Attorneys for Defendant
ALLSTATE INDEMNITY COMPANY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| DIANE MYERS,<br><br>      Plaintiff,<br><br>  v.<br><br>ALLSTATE INDEMNITY COMPANY, DOES 1 to 20, inclusive,<br><br>      Defendants. | Case No. SACV14-00406-JLS (DFMx)<br><br>The Honorable Josephine L. Staton<br>Courtroom 10A<br><br>**DECLARATION OF CARLA STYLES IN SUPPORT OF DEFENDANT ALLSTATE INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>DATE:  June 12, 2015<br>TIME:  2:30 p.m.<br><br>[Complaint Filed:  February 13, 2014] |

SMRH:437034641.1

Case No. SACV14-00406-JLS DFMx
DECL. OF CARLA STYLES ISO DEFENDANT ALLSTATE INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT

I, Carla Styles, declare:

1. I am a Senior Claims Adjuster for Allstate Indemnity Company ("Allstate"). I have been working for Allstate for about 29 years. Except where the context indicates otherwise, I have personal, firsthand knowledge of the following facts.

2. As a Senior Claims Adjuster, my job responsibilities include adjusting uninsured and underinsured motorist claims arising from automobile accidents, including injury claims. As part of my job duties when adjusting an underinsured motorist claim, I review the insurance policy and claim file, gather information from the insured and others (i.e., medical providers) regarding the injuries, review medical records and any other information regarding the claim, obtain an independent medical examination if applicable, evaluate the claim based on information provided, and pay claims based on the information provided. I also have extensive experience, knowledge, and training in evaluating personal injuries, including 15 years of reviewing and interpreting medical records and 15 years of consultation with nurses, doctors, chiropractors, and others in the medical profession in connection with the adjustment of claims. I have also spent over 15 years reviewing and adjusting thousands of medical bills in thousands of claims including charges for physical therapy, surgery, chiropractic care, epidural and other steroid injections, and other accident-related medical treatments, and evaluating and determining reasonable and customary charges for medical services based on customary charges by medical professionals throughout Southern California. As a Senior Claims Adjuster, I estimate that I have evaluated over 10,000 injury claims and reviewed and interpreted thousands of pages of medical records.

3. In my capacity as a Senior Claims Adjuster, I am personally familiar with the manner in which Allstate files and records are generally prepared and maintained with respect to underinsured motorist claims. As part of its normal business activities, Allstate's employees and representatives maintain information

1. that Allstate generates and receives regarding claims and losses in a claim file and claim notes. The claim file for a particular underinsured/uninsured motorist claim generally contains records and documentation regarding Allstate's handling of that claim, including correspondence, notes, medical reports and charts, medical bills and invoices, payment records, and compilations of other data prepared at or near the time of the acts, events or conditions identified or described in each document. The claim notes function as a diary of activities regarding a given claim that are entered by adjusters or other claim personnel at or near the time of the acts or events described therein. Allstate relies upon information in claim files, claim notes, and policy files for the investigation, adjustment, and payment of claims. True and correct copies of relevant excerpts from the claim notes are attached as **Exhibit 2** to Allstate's Notice of Filing of Exhibits in support of its Motion for Summary Judgment or, Alternatively, Partial Summary Judgment ("NOF") and are maintained as part of the claim file.

4. I was personally involved in handling Diane Myers' ("Ms. Myers") underinsured motorist claim ("UIM claim") arising out of her April 3, 2012 automobile accident. I was assigned to the claim in January 2013 when Ms. Myers' made an underinsured motorist claim to Allstate. At the time of my assignment, I reviewed all the claim notes and file documents that were generated before my involvement.

5. As part of my job duties as Senior Claims Adjuster, I reviewed Allstate's claim file and any other relevant documents in Allstate's possession relating to Ms. Myers' UIM claim and am familiar with their contents.

6. According to Allstate's records, at the time of the April 3, 2012 accident, Ms. Myers was insured under an Allstate automobile policy. The policy provided UIM coverage in the amount of $250,000 and medical payments coverage in the amount of $5,000. Attached as **Exhibit 1** to Allstate's NOF are true and correct copies of the Allstate policy, declarations and endorsements.


7. On or about April 18, 2012, Ms. Myers reported to Allstate that she was in an accident about two weeks earlier, on April 3, 2012. Attached as **Exhibit 2 at pp. 66-67** to Allstate's NOF are true and correct copies of relevant excerpts from the claim notes.

8. On April 18, 2012, Allstate sent a letter to Ms. Myers asking her to provide a list of medical providers and a medical authorization so that Allstate could obtain her medical records. Attached as **Exhibit 3** to Allstate's NOF is a true and correct copy of Allstate's April 18, 2012 letter, which is maintained in the claim file in the ordinary course of business.

9. In April 2012, Allstate inspected Ms. Myers' vehicle. Allstate paid Myers over $8,000 for the vehicle to be repaired and a rental car. Attached as **Exhibit 4** to Allstate's NOF is a true and correct copy of a payment ledger for the automobile repair and the rental car, which is maintained in the claim file in the ordinary course of business.

10. In May 2012, Allstate began paying medical payments coverage. Allstate paid the full $5,000 medical payments coverage limit for Ms. Myers' medical expenses. Attached as **Exhibit 5** to Allstate's NOF is a true and correct copy of the payment ledger reflecting the $5,000 payment which is maintained in the claim file for the medical payments coverage in the ordinary course of business.

11. On January 7, 2013, Ms. Myers demanded arbitration for her UIM claim, but she had not yet submitted proof that she had exhausted the policy limits of the at-fault driver, which is require for a UIM claim to accrue. Attached as **Exhibit 6** to Allstate's NOF is a true and correct copy of the January 7, 2013 letter from Ms. Myers' attorney, which is maintained in the claim file in the ordinary course of business.

12. On January 24, 2013, Ms. Myers' attorney, Steven Zwick, sent a letter to Allstate making a UIM claim on behalf of Ms. Myers. Mr. Zwick included proof

that Ms. Myers had been paid the $15,000 underlying limits from the at-fault driver. Because the Insurance Code and the policy require the insured to exhaust all available policy limits for the loss before making a UIM claim, Ms. Myers' UIM claim accrued on January 24, 2013, when she submitted proof that she recovered policy limits from the at fault driver. Mr. Zwick also demanded $250,000 policy limits, less the $15,000 offset for payment from the at-fault driver's insurer,[1] totaling a net demand of $235,000. In his letter, Mr. Zwick specifically claimed $52,919 for medical expenses and $300,000 for general pain and suffering, totaling $352,919. Mr. Zwick's letter did not contain a monetary demand for future medical expenses, and stated that future medical expenses were "unknown". Attached as **Exhibit 7** to Allstate's NOF is a true and correct copy of Mr. Zwick's January 24, 2013 letter with its attachments, which is maintained in the claim file in the ordinary course of business.

13. Mr. Zwick also included some medical records with his January 24, 2013 letter, but I noticed that some medical records were missing. On January 30, 2013, I sent Mr. Zwick a letter asking him to provide me with a list of Ms. Myers' medical providers and a signed medical authorization so that I could obtain all of Ms. Myers' medical records directly from her medical providers. Attached as **Exhibit 8** to Allstate's NOF is a true and correct copy of my January 30, 2013 letter with its attachments, which is maintained in the claim file in the ordinary course of business.

---

[1] I understand from handling these claims over the years that there are two offsets that apply to reduce the amount of UIM coverage available under the policy comprised of payments made under the medical payments coverage and payments made by the at-fault driver's insurer. The offsets for Ms. Myers' claim totaled $20,000 ($5,000 that Allstate paid for medical payments coverage and $15,000 paid by the at-fault driver's insurer).

14. Mr. Zwick never provided me with the medical authorization that I requested. He sent me an authorization for release of records to him, but not to me, which I could not use. He also did not send me the list of medical providers that I requested.

15. In February 2013, I asked Mr. Zwick for specific medical records that were missing from his demand package. Specifically, on February 11, 2013, I spoke with Mr. Zwick over the phone and sent him a letter. In the phone call and letter, I asked for missing medical reports from Ortho Specialties and I also confirmed that Ms. Myers did not receive chiropractor treatment. Attached as **Exhibit 9** to Allstate's NOF is a true and correct copy of my February 11, 2013 letter which is maintained in the claim file in the ordinary course of business.

16. On February 21, 2013, I sent Mr. Zwick another letter following up regarding the missing orthopedic reports. Attached as **Exhibit 10** to Allstate's NOF is a true and correct copy of my February 21, 2013 letter which is maintained in the claim file in the ordinary course of business.

17. On March 7, 8, and 19, Mr. Zwick provided missing medical records that I had requested. The missing reports were from Dr. Prietto, who was Ms. Myers' first orthopedic surgeon who she saw after the accident. From these new records, I observed that Dr. Prietto had ordered an MRI of Ms. Myers' shoulder and based on the findings determined that her shoulder symptoms did not necessitate surgery. Ms. Myers subsequently switched to a new doctor (Dr. Van Der Reis), who performed the surgery. Attached as **Exhibit 11** to Allstate's NOF are true and correct copies of Mr. Zwick's March 7, 8, and 19 letters with attachments, which are maintained in the claim file in the ordinary course of business.

18. Once I had the missing medical records, in late March 2013, I evaluated the claim. I reviewed the demand letter and the medical documentation. In the demand, Ms. Myers was claiming that she sustained a left shoulder injury for which she underwent surgery, a meniscus tear in her left knee, and pain in her lower

back and right rib. I reviewed the medical records and made the following observations. In April 2012, Ms. Myers had initially seen Dr. Prietto complaining of pain in her left shoulder and left knee. In April 2012, Dr. Prietto ordered an MRI of her left shoulder and observed left shoulder rotator cuff tendinitis, which is a non-acute condition that occurs over time. Based on those findings, Dr. Prietto determined that Ms. Myers' symptoms did not necessitate surgery. Dr. Prietto also examined Ms. Myers' left knee and determined that she had patellofemoral arthritis, which is a pre-existing degenerative knee disease. He recommended physical therapy for both her left shoulder and left knee to resolve her pain. On April 24, 2012, Ms. Myers went to a physical therapist (Kerri Pooley) recommended by Dr. Prietto. The physical therapist reported that Ms. Myers had pre-existing "low back pain." Instead of completing the physical therapy recommended by Dr. Prietto, on June 5, 2012, Ms. Myers visited a different doctor (Dr. Van Der Reis). In August 2012, Dr. Van Der Reis performed surgery on Ms. Myers' shoulder notwithstanding Dr. Prietto's recommendation against it. Dr. Van Der Reis also ordered an MRI of Ms. Myers' knee. The MRI showed there was no meniscus tear, but rather, that Ms. Myers had chondromalacia, a pre-existing degenerative disease. I also observed that Dr. Prietto and Dr. Van Der Reis did not opine on Ms. Myers' claimed lower back or rib pain. I observed that, on June 28, 2012, about two months after the accident, Ms. Myers visited a pain management doctor named Dr. Green complaining of lower back, rib, and left knee pain. Dr. Green also did not opine on the cause of Ms. Myers' lower back or rib pain. He recommended chiropractic treatment for Ms. Myers' pain, but I later learned from Ms. Myers' counsel that Ms. Myers did not pursue the chiropractic treatment. The records showed that she went to Dr. Green monthly from August 2012 to January 2013 and he refilled her pain medication prescriptions. I observed that none of Ms. Myers' three doctors (Dr. Prietto, Dr. Van der Reis and Dr. Green) opined on the cause of Ms. Myers' claimed lower back injury and rib pain. I observed that the physical therapist that Ms. Myers visited

right after the accident, in April 2012, attributed Ms. Myers' low back pain to a pre-existing injury. **Exhibits 7 and 11** to the NOF contain the medical records that I reviewed. Also see **Exhibit 2, at page 55-56** which are claim notes related to the evaluation.

19. Notwithstanding the conflicting information, I gave Ms. Myers credit for all of her medical treatment in my evaluation. I accepted all of Myers' medical bills for payment, and adjusted them to the reasonable and customary amounts for the services provided based on my 29 years of experience adjusting medical bills and my evaluation of each of the bills submitted and the services provided. The adjustment also accounted for a duplicate $10,000 charge for the shoulder surgery. The reasonable medical expenses for all of the medical services provided totaled $31,724 Attached as **Exhibit 12** to Allstate's NOF is a true and correct copy of my dissection worksheet wherein I handwrote the actual amounts stated on the medical bills and the reasonable and customary amounts for those services, which is maintained in the claim file in the ordinary course of business. Also see **Exhibit 2, at page 55-56** which are claim notes related to the evaluation.

20. I valued the claim at $45,500 ($25,500 new money and $20,000 in applicable offsets). My offer included all of Ms. Myers' reasonable medical expenses of $31,724 plus about $14,000 for pain and suffering.

21. In March 2013, I made the offer based on my $45,500 valuation. On March 28, 2013, Mr. Zwick sent me a letter wherein he rejected my $45,400 offer ($25,500 new money plus the $20,000 offsets) and demanded payment for a future knee surgery. Attached as **Exhibit 13** to Allstate's NOF is a true and correct copy of Mr. Zwick's March 28, 2013 letter acknowledging the offer amount and rejecting it, which is maintained in the claim file in the ordinary course of business.

22. In April 2013, based on the future knee surgery claim and the pre-existing conditions documented in the medical records (i.e., the lower back pain, the knee chondromalacia), I decided to retain an independent orthopedic surgeon to

provide a medical opinion on the nature, cause and extent of Ms. Myers' injuries. I spoke with Mr. Zwick over the phone about this, and documented it in a claim note. Attached as **Exhibit 2, at 54** to Allstate's NOF is a true and correct copy of my claim note documenting my discussion with Mr. Zwick that Allstate planned to obtain an independent medical evaluation (known as an "IME").

23. In April 2013, Allstate retained counsel to obtain an independent medical evaluation of Ms. Myers on Allstate's behalf and to handle the arbitration. I learned that Ms. Dadaian immediately propounded written discovery to Ms. Myers to obtain a list of her medical providers because Mr. Zwick never sent the signed medical authorization that I had requested of him. I understood that Ms. Dadaian was going to use the list of providers to subpoena their records in order to provide all the medical records to the independent medical doctor.

24. By September 2013 additional medical records were produced that Allstate's arbitration counsel subpoenaed. These records were not previously provided to Allstate by Ms. Myers. Attached as **Exhibit 14** are true and correct copies of some of the subpoenaed medical records.

25. The medical records that were subpoenaed from the medical providers reflected that Ms. Myers had additional pre-existing injuries to some of the same parts of her body that she was claiming in this case. For example, from 2008 through 2011, Ms. Myers was treated for a lower back injury for which she had been receiving epidural injections. No doctor has since opined that the April 2012 accident exacerbated or caused a lower back injury. From 2008 up through 2011, Ms. Myers was diagnosed with chronic pain, and she had been treated for pain to her back, head, legs, shoulder, and rib. In 2011, Ms. Myers was treated for a prescription drug addiction, which raised questions about some of her post-accident pain complaints for which she received opiate/barbiturate prescriptions. See **Exhibit 14**.

SMRH:437034641.1

-9-

Case No. SACV14-00406-JLS DFMx
DECL. OF CARLA STYLES ISO DEFENDANT ALLSTATE INDEMNITY
COMPANY'S MOTION FOR SUMMARY JUDGMENT

26. I learned that, in July 2013, Ms. Dadaian agreed to use one of the arbitrators that Ms. Myers' attorney selected and, in August 2013, the parties had agreed to a December 2013 arbitration date. I also learned that Ms. Dadaian took Ms. Myers' deposition in August 2013.

27. I learned that, in October 2013, Ms. Dadaian had Ms. Myers examined by a board certified orthopedic surgeon, by the name of Scott Rosenzweig after she had provided him with Ms. Myers' medical records.

28. In October 2013, I received and reviewed a copy of Dr. Rosenzweig's report. In his report, Dr. Rosenzweig concluded that Ms. Myers sustained a soft tissue shoulder injury and possibly knee bruising (contusion) from the accident and that injections and physical therapy treatment for those injuries was reasonable. However, Dr. Rosenzweig agreed with Ms. Myers' first orthopedic doctor that shoulder surgery was not medically necessary based on Ms. Myers' symptoms and MRI results, and that it was premature before completion of the physical therapy regimen. He also concluded that Ms. Myers had chondromalacia, a pre-existing degenerative knee disease, and that any need for a future knee surgery was not attributable to the accident. He also determined that Ms. Myers did not sustain a lower back injury as a result of the accident. Attached as **Exhibit 22** to the NOF is a true and correct copy of Dr. Rosenzweig's October 18, 2013 medical report, which is maintained in the claim file in the ordinary course of business. See also **Exhibit 2, at p. 53,** for my claim notes related to my review of the doctor report.

29. Upon reviewing Dr. Rozenzweig's report, in November 2013, I re-evaluated the claim. Although I had already made an offer that covered all of Ms. Myers' reasonable medical expenses, and although the medical expert determined that Ms. Myers did not need a future knee surgery as a result of the accident, I raised my valuation to $73,000 ($53,000 new money offer, after the $20,000 offsets), as a compromise in an effort to resolve the claim. That amount was enough to cover all of Ms. Myers' reasonable medical expenses of $31,729 plus over $40,000 for pain

and suffering. The offer was also enough to cover Ms. Myers' claimed medical expenses of $52,919 without the adjustments. In sum, Allstate's offer was enough to cover all medical expenses, plus pain and suffering. Ms. Myers rejected the offer, and continued to demand policy limits.

30. In November 2013, I learned that Dr. Rosenzweig had his deposition taken. In the deposition, he was asked about whether he believed Ms. Myers had a rib injury from the accident. I learned that he opined that she did not have any rib dislocation, but that she may have had some rib bruising from the accident. That opinion did not change my evaluation because I had already allowed for all of Ms. Myers' medical treatment and for pain and suffering, and there was no claim for future treatment to her rib.

31. I learned at the time of the arbitration hearing that Ms. Myers had just announced a brand new monetary demand of $66,438 for "future" epidural injections in her lower back for a period of 4 years. This demand was not previously made to Allstate, Allstate had never received any medical report of a doctor that had opined that Ms. Myers' lower back injury was related to the accident (the only report with an opinion was the independent medical expert who opined that the lower back pain/injury was unrelated to the accident), and none of the documents that Ms. Myers provided to Allstate included any specific monetary demand for epidural injections in her lower back.

32. On December 13, 2013, the arbitration took place. The arbitrator awarded Ms. Myers $297,655, which he reduced to policy limits of $250,000 ($230,000 after applicable offsets). Attached as **Exhibit 24** to the NOF is a true and correct copy of the arbitration award, which is maintained in the claim file in the ordinary course of business.

SMRH:437034641.1

-11-

Case No. SACV14-00406-JLS DFMx
DECL. OF CARLA STYLES ISO DEFENDANT ALLSTATE INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT

33. In January 2014, Allstate issued a check to Ms. Myers for the full $230,000 arbitration award. Attached as **Exhibit 25** to the NOP is a true and correct copy of a ledger reflecting the payment of the $230,000 arbitration award, which is maintained in the claim file in the ordinary course of business.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed April __, 2015, at San Diego, California.

_____
Carla Styles